Filed 10/27/21  In re P.C. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re P.C. et al., Persons Coming Under the Juvenile Court Law. | |
| | D079003 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. Nos. J519874A-B) |
| v. | |
| P.R., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Matthew C. Braner, Judge.  Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel and Lisa M. Maldonado, Deputy County Counsel for Plaintiff and Respondent.

P.R. (Father) appeals from the juvenile court's orders terminating parental rights to his son, P.C., and daughter, M.C. (together the children).

(Welf. & Inst. Code, § 366.26.)[1] He contends that the juvenile court erred in finding that the beneficial parent-child relationship exception to adoption did not apply because he maintained consistent visitation and had a beneficial relationship with the children.[2] (§ 366.26, subd. (c)(1)(B)(i).) We disagree and affirm the orders terminating parental rights.

FACTUAL AND PROCEDURAL BACKGROUND

In 2017, the San Diego County Child Welfare Services Agency (Agency) received two reports of domestic violence between the parents. During one incident, P.C. hit his head against a wall when Mother pushed Father as he held P.C. In July 2018, the Agency received a referral regarding a domestic violence incident between the parents at the hospital after M.C.'s birth. In early October 2018, the Agency filed petitions on behalf of the children under section 300, subdivision (b)(1) alleging that a substantial risk existed that the children would suffer serious physical harm or illness based on domestic violence. The petitions recounted an incident in late September 2018 where Father brandished a knife and threatened to kill Mother. The protective custody warrant affidavit recounted Mother's statements that Father pushed her against a wall, threw her on the floor, and threw items at her and around the room. Father also hit Mother as she held M.C. and then choked Mother. The children were crying and P.C. hit Father attempting to stop the assault.

Mother obtained a restraining order requiring that Father remain 100 yards away from her and have no contact with the children. Father did not appear at the detention hearing where the juvenile court made a prima facie

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Father and Mother are not married and Mother is not a party to this appeal.

2

finding on both petitions, detained the children, and ordered supervised visitation for Mother. In late October 2018, the Agency placed the children with the maternal grandmother (the caregiver). At that time, P.C. was 19 months old and M.C. was three months old. When Father appeared later that month, the court appointed counsel and ordered a paternity test. In December 2018, the court granted the caregiver's request for de facto parent status and received notification that Father was the children's biological father.

In early January 2019, the court modified the restraining order to remove the children as protected parties. At the contested adjudication and disposition hearing in January 2019, the juvenile court sustained the petitions, declared the children dependents, ordered reunification services, signed a restraining order protecting Mother from Father, allowed Mother unsupervised visitation, and Father supervised visitation.

In June 2019, Mother gave birth to H.C. Although Father initially denied paternity, he later admitted that the infant was his son. In July 2019, Father started twice a week unsupervised visitation with the children for four hours. On August 1, 2019, the court continued reunification services for both parents and ordered that they receive unsupervised visitation.

In late March 2020, Mother's car broke down on the street where Father lived. Mother locked herself and H.C. in the car when Father started yelling at her. Father then jumped on the hood of the car and stomped on the windshield, causing it to crack. Based on this incident, in April 2020 the Agency reverted the parents to supervised visitation. In September 2020, Father and his girlfriend had a child together. The Agency removed the child because he and the mother tested positive for methamphetamine. During the investigation, the Agency learned that Father had engaged in domestic

3

violence with his girlfriend that included choking her. At the 18-month review hearing in September 2020, the juvenile court granted the Agency's section 388 motions to formally revert the parents to separate, supervised visitation. It also terminated reunification services and set a section 366.26 hearing.

The Agency's final report addressed the best interests of the children. The social worker noted Father's history of domestic violence with Mother. She also remarked that despite completing 25 sessions of a 52-week domestic violence treatment program in April 2020, Father engaged in another domestic violence incident with Mother in March 2020. Father then stopped attending his domestic violence treatment program due to the COVID-19 pandemic but did not re-enroll despite receiving authorization to continue his program with a different provider. In December 2020, Father re-enrolled in domestic violence treatment but did not begin his sessions until February 2021. Although the children had been out of Father's care since October 2018, the social worker noted that Father loved them, parented and attended to them during visits, and that the children referred to him as "daddy."

The contested section 366.26 hearing in May 2021 proceeded as a trial on the documents. After denying Father's section 388 motion to reinstate reunification services and transition the children to his care, the juvenile court concluded that the parent-child relationship exception did not apply and terminated parental rights. The court selected adoption as the children's permanent plan and designated the children's caregiver as the prospective adoptive parent. Father timely appealed.

DISCUSSION

A.  *General Legal Principles*

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed."  (*In re J.D.* (2021) 69 Cal.App.5th 594, 612.)  At this hearing "the juvenile court has three options:  (1) to terminate parental rights and order adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care.  [Citation.]  Adoption is the preferred plan and, absent an enumerated exception, the juvenile court is required to select adoption as the permanent plan.  [Citation.]  The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions."  (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

One of the exceptions to the preference for adoption is the beneficial parent-child relationship exception.  (§ 366.26, subd. (c)(1)(B)(i).)  For this exception to apply, the parent must show by a preponderance of the evidence: (1) regular visitation and contact with the child; (2) the child has a substantial, positive, emotional attachment to the parent; and (3) terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home.  (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)  The existence of this relationship is determined by taking into consideration "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  When the benefits of a stable, adoptive, permanent home outweigh the harm

5

the child would experience from the loss of a continued parent-child relationship, the court should order adoption.  (*Caden C.*, at p. 634.)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parent-child relationship, for substantial evidence.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.)  As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists.  (*Id.* at p. 640.)  "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion."  (*Ibid.*)  A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' "  (*Id.* at p. 641.)

B.  *The Juvenile Court's Ruling*

The juvenile court found the children specifically and generally adoptable.  It acknowledged that Father loved his children but expressed concern that even though Father attended half of his domestic violence classes, "low and behold, more [domestic violence] occurred."  The court stated that it would be "traumatic" to the children to upset their current living arrangement with their caregiver.  Focusing on the children's best interests, the court agreed "with caregiver's counsel that there really is no exception that would justify making a finding other than adoption" and found that "adoption is far and away the most appropriate program for these children."  After acknowledging that the purpose of dependency court is to resolve "the situation to give the children as much permanence as possible,"

it found that termination of parental rights would not be detrimental to the children.

C. *Analysis*

The juvenile court did not make an express finding regarding the regularity or consistency of Father's visitation. The Agency concedes that the first element, regular visitation and contact, is not in dispute. We agree that Father maintained consistent visitation throughout the case to the extent that the juvenile court permitted visitation.

The juvenile court also did not make an express finding whether Father provided the children with the type of significant, positive emotional attachment required for application of the beneficial parental relationship exception to termination of parental rights. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) The Agency contends that substantial evidence does not support a finding that Father had proven this element of the exception. At this step of the analysis the juvenile court must "consider the evidence showing whether the parent's actions or inactions 'continued or developed a significant, positive, emotional attachment from child to parent.' " (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230 (*B.D.*).)

The children were very young, 19 and three months old, when they started living with their caregiver. When they left Father's care the children were too young to have developed a strong emotional attachment to him or understand the concept of a biological father. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 459, 467.) Nonetheless, during Father's supervised visitation over the two and one-half years of this dependency proceeding social workers noted that Father consistently responded appropriately to a child's verbal/nonverbal signals, showed empathy toward the children, and demonstrated a parental role and knowledge of child development.

For the purposes of analysis, we will assume that the record supports a finding that the children would derive some benefit from continuing their relationship with Father. (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646-647 ["The court's decision a parent has not satisfied [the parent-child relationship exception] burden may be based on any or all of the component determinations. . . ."], disapproved on other ground by *Caden C.*, *supra*, 11 Cal.5th at p. 637, fn. 6.) Accordingly, application of the beneficial parental relationship exception turns on the juvenile court's express finding that terminating parental rights would not be detrimental to the children. On this issue, despite Father's consistent visitation and beneficial relationship with the children, the juvenile court did not abuse its discretion in ultimately concluding that the benefits the children would realize from adoption outweighed any harm or detriment they might suffer from the termination of parental rights.

Despite a well-documented history of domestic violence with Mother, in December 2018 Father denied domestic violence in his relationship with her. Over a year later, the social worker reported that Father did not believe he needed services because "the allegations and the whole case was based on 'lies.'" After these denials, Father engaged in domestic violence with his girlfriend. Accordingly, the juvenile court properly acknowledged Father's unresolved history of domestic violence because this impacted the beneficial nature of his relationship with the children. (*In re Benjamin D.* (1991) 227 Cal.App.3d 1464, 1470, fn. 5 ["[C]ommon sense and expert opinion indicate [domestic] violence is detrimental to children."].)

Father contends that terminating his parental rights would be detrimental to the children because they enjoyed their time with him, nothing indicated they were ready to give up their relationship with him, or

that they shared a similar relationship with anyone else. Although the record shows that the children enjoyed their time with him, this is a point the Agency never disputed. Except for one visit where P.C. did not want to be placed in his car seat, began to cry, and repeatedly stated that he wanted to go with Father, the children easily separated from Father at the end of visits without distress.

At the time of the section 366.26 hearing, M.C. had been living with the caretaker for almost her entire life and P.C. had lived with the caregiver for over one-half of his life. Social workers noted that the children were "happy and thriving" with their caretaker, referring to her as " 'mami' (mommy)." The children's caretaker expressed a commitment to providing them with a permanent and stable home through adoption. Thus, contrary to Father's assertion, the record shows that the children enjoyed a close relationship with their caretaker.

While the children enjoyed their visits with Father, the social worker noted that the children learned that the visitation location is "where they go to play and eat snacks." Despite the positive attachment that the children developed towards Father during the dependency proceedings, Father did not play a significant role in their lives. For example, although Father stated he would attend two medical appointments, one in February 2021 and the other in May 2021, he did not appear at the appointments. For the February appointment, Father told the social worker that he had " 'other things to do' " and added that it was the caregiver's responsibility to take the child to the doctor.

Crucially, Father did not present any evidence that the children would be greatly harmed by severance of the parental relationship, or that the security and stability of a new home would not outweigh the loss of this

relationship.  " 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)  On this record, the juvenile court did not exceed the limits of legal discretion in determining that providing the children this commitment outweighed the benefit that they would gain through maintaining their pleasant, positive relationship with Father.  (*Caden C., supra,* 11 Cal.5th at p. 641.)  We therefore affirm the juvenile court's orders as we find no evidence of exceptional circumstances requiring application of the parent-child relationship exception to the termination of Father's parental rights.

DISPOSITION

The orders terminating parental rights are affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:


GUERRERO, J.


DO, J.